FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2019 AUG 29  A 11: 51

WILLIAM W. BLEVINS
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

# FELONY

**INDICTMENT FOR CONSPIRACY TO SOLICIT**
**A BRIBE, GIVE A BRIBE, AND COMMIT HONEST**
**SERVICES WIRE FRAUD, HONEST SERVICES WIRE FRAUD,**
**SOLICITING AND DEMANDING A BRIBE, AND NOTICE OF FORFEITURE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 19-00173 |
| **v.** | * | **SECTION:** SECT. H MAG. 5 |
| **RODNEY J. STRAIN, JR.** | * | **VIOLATIONS:** 18 U.S.C. § 2 |
| **(a/k/a "JACK STRAIN")** | | 18 U.S.C. § 371 |
| | * | 18 U.S.C. § 666(a)(1)(B) |
| | | 18 U.S.C. § 666(a)(2) |
| | * | 18 U.S.C. § 1343 |
| | | 18 U.S.C. § 1346 |
| | * | |

\*      \*      \*

The Grand Jury charges that:

## COUNT 1
(18 U.S.C. §§ 371, 666(a)(1)(B), 666(a)(2), 1343, 1346)
(Conspiracy to Solicit and Demand a Bribe Concerning Program Receiving Federal Funds, Give a Bribe Concerning Program Receiving Federal Funds, and Commit Honest Services Wire Fraud)

A.      **AT ALL TIMES MATERIAL HEREIN:**

**Background**

*St. Tammany Parish Sheriff's Office*

⌀ Fee_____
✗ Process_____
✗ Dktd_____
___ CtRmDep_____
___ Doc. No._____

1.      The St. Tammany Parish Sheriff's Office (STPSO) was an agency of St. Tammany Parish, a local government/municipality within the State of Louisiana.

2.      During each calendar year from 2013 through 2017, STPSO received more than $10,000 from the United States Government under various federal programs.

3.      During each calendar year from 2013 through 2017, St. Tammany Parish received more than $10,000 from the United States Government under various federal programs.

4.      STPSO was the chief law enforcement agency of St. Tammany Parish. In that capacity, STPSO was responsible for, among other things, enforcing local and state laws, serving as the tax collector for St. Tammany Parish, and operating incarceration facilities for inmates, select pre-trial criminal defendants, and adjudicated offenders within St. Tammany Parish.

5.      STPSO fell under the authority of the Sheriff, an elected official who was the chief law enforcement officer in St. Tammany Parish. The Sheriff of STPSO had unilateral authority to enter into certain contracts binding STPSO, including professional service contracts.

6.      STPSO provided a pension program for qualifying employees.

**Rodney J. Strain, Jr. (a/k/a Jack Strain)**

7.      From about 1996 to June 2016, **RODNEY J. STRAIN, JR.,** (a/k/a "**JACK STRAIN**") ("**STRAIN**") was the Sheriff of STPSO. As such, **STRAIN** was an agent of STPSO for purposes of Title 18, United States Code, Section 666.

8.      **STRAIN** maintained and had signatory authority over a bank account at Citizens Bank & Trust Company ("Citizens Bank") bearing account number x2662 in the name of "Jack Strain, Jr. Campaign Fund" (the "Strain Campaign account").

9.      Person 1 was **STRAIN's** adult son.

2

**David Hanson**

10.     **David Hanson ("Hanson")** was employed by STPSO from not later than 2008 to about June 2016.  Most recently, **Hanson** oversaw and supervised STPSO's Canine Division. **Hanson** was an agent of STPSO for purposes of Title 18, United States Code, Section 666.

11.     **Hanson** met **STRAIN** while they were both in grade school in Abita Springs, Louisiana.  Thereafter, **Hanson** and **STRAIN** worked together in the Abita Springs Police Department.  **Hanson** and **STRAIN** became friends and participated in numerous social activities with one another.

12.     **Hanson** operated and controlled a bank account at Capital One Bank, N.A., bearing account number x0573 (the "David Hanson account").

13.     **Hanson** possessed and used an American Express Gold credit card in his name bearing account number x61007 (the "Hanson American Express Gold Card").

14.     B.H. was **Hanson's** adult daughter.

15.     B.H. operated and controlled a bank account at Citizens Bank bearing account number x9553 (the "B.H. account").  B.H. used the B.H. account to transfer money to **Hanson**.

16.     T.H. was **Hanson's** wife.

17.     B.H. and T.H. jointly operated and controlled a bank account at Capital One Bank, N.A., bearing account number x1096 (the "T.H. and B.H. account").

**Clifford "Skip" Keen**

18.     **Clifford "Skip" Keen ("Keen")** was employed by the STPSO from about July 1997 to about June 2016.  Most recently **Keen** oversaw and supervised STPSO's Maintenance Department.  **Keen** was an agent of STPSO for purposes of Title 18, United States Code, Section 666.

3

19.     **Keen** knew **STRAIN** since **Keen** was a small child.  **STRAIN** was approximately five and one-half years older than **Keen**.

20.     **Keen**, jointly with his wife, V.K., operated and controlled a bank account at Home Bank, N.A., bearing account number x4958 (the "Skip Keen account").

21.     J.K. was **Keen's** adult son.

22.     J.K. and **Keen** controlled a bank account at Citizens Bank in J.K.'s name bearing account number x9502 (the "J.K. Citizens account").

23.     **Keen** possessed, controlled, and used a debit card bearing card number x1911 drawn on the J.K. Citizens account.

24.     On or about January 13, 2017, J.K. opened a checking account in his name at Home Bank, N.A., bearing account number x0202 (the "J.K. Home Bank account").  J.K. and **Keen** both controlled the J.K. Home Bank account.

### Work Release Programs in St. Tammany Parish

25.     STPSO was responsible for operating work release programs for qualified state and parish prisoners within St. Tammany Parish.  The work release programs promoted public safety through the successful reintegration of rehabilitated individuals returning to the community after their incarceration.  Participants focused on transitioning from incarceration to becoming productive members of the community and reconnecting with family members by finding and retaining employment.  Inmates participating in work release programs often received specialized housing and the opportunity to work in non-custodial, private employment environments approved and obtained by the work release program.

26.     The laws of the State of Louisiana provided that "[t]he sheriff of each parish . . . is hereby authorized to establish and administer a work release program for inmates of any jail or

prison under his jurisdiction." *See* La. Rev. Stat. 15:711(a). Every inmate with work release privileges was liable for the cost of his room, board, clothing, and other "necessary expenses incident to his employment or placement." *See* La. Rev. Stat. 15:711(c). The wages of any inmate employed through a work release program were to be "collected by the sheriff or by his designated agent[.]" *See* La. Rev. Stat. 15:711(d).

27.     A work release program generated income for the entity operating it in at least two ways. First, the entity received payment from the Louisiana Department of Corrections for housing inmates. Second, the entity kept a portion of the wages paid by private employers for work performed by participating inmates.

28.     Before about November 2007, STPSO operated a work release program in St. Tammany Parish, located at 141 Production Drive, Slidell, Louisiana 70460, within the Eastern District of Louisiana (the "Slidell work release program").

29.     In about 2007, **STRAIN** decided to open a second work release program in Covington, Louisiana, which he chose to be operated by a private entity (the "Covington work release program"). Because work release programs were considered "professional services," the STPSO Sheriff had the unilateral authority to grant the right to operate work release programs to the private entity of his choice.

30.     In about November 2007, **STRAIN** entered into a cooperative endeavor agreement with Company 1 to operate the Covington work release program without seeking competitive bids. From about January 2008 to about March 2014, Company 1 privately operated the Covington work release program.

31.     In about 2008, **STRAIN** arranged for **Keen** to be employed on a part-time basis at the Covington work release program.  From about 2008 through about 2014, **Keen** was paid approximately $30,000 per year for working at the Covington work release program.

32.     In about early 2013, **STRAIN** decided to privatize the Slidell work release program.

33.     In about early 2013, **STRAIN, Hanson**, and **Keen** discussed making **Hanson** and **Keen** joint owners and operators of the Slidell work release program.

34.     Assuming ownership and control of the Slidell work release program would have required **Hanson** and **Keen** to resign from STPSO and, consequently, lose their salaries and pension increases from their continued employment at STPSO.

### St. Tammany Workforce Solutions, LLC

35.     On or about March 23, 2013, St. Tammany Workforce Solutions, LLC was incorporated with the Louisiana Secretary of State.  The registered agent was Person 2, and its officers were B.H., J.K., and Person 2.

36.     Person 2 operated and controlled a bank account at JPMorgan Chase Bank, N.A., bearing account number x0495 (the "Person 2 account").

37.     On or about May 1, 2013, B.H., J.K., and Person 2 entered into a legally binding operating agreement for St. Tammany Workforce Solutions, LLC.  According to the agreement, Person 2 was to be responsible "for the daily operations and management of [St. Tammany Workforce Solutions, LLC] including the sole authority to hire and fire [its] employees" and enjoyed a ten (10) percent ownership share as well as a ten (10) percent share of all profits.  B.H. and J.K. each enjoyed a forty-five (45) percent ownership share of St. Tammany Workforce Solutions, LLC, which entitled each of them to a forty-five (45) percent share of all profits.

6

38.     St. Tammany Workforce Solutions, LLC operated and controlled bank accounts at Citizens Bank bearing account numbers x1185 and x1223 (the "St. Tammany Workforce Solutions accounts").

39.     On or about June 4, 2013, **STRAIN** entered into a cooperative endeavor agreement ("privatization agreement") on behalf of STPSO with St. Tammany Workforce Solutions, LLC to operate the Slidell work release program.

40.     The privatization agreement provided, in relevant part, that **STRAIN** would "lease to St. Tammany Workforce Solutions, LLC, the premises located at 141 Production Drive, Slidell, LA" from July 1, 2013, through July 1, 2016, that St. Tammany Workforce Solutions, LLC would "operate and manage" the work release program, and that St. Tammany Workforce Solutions, LLC would comply "with all federal, state, and local, laws, rules, and regulations, including but not limited to La. R. S. 15:711, fire code, health regulations, and DOC regulations."

41.     According to the privatization agreement and operative State of Louisiana regulations, STPSO would submit invoices to the Louisiana Department of Corrections for participants in the Slidell work release program.  STPSO then remitted the amount paid by the Louisiana Department of Corrections on these invoices to St. Tammany Workforce Solutions, LLC.

42.     Between on or about June 27, 2013, and on or about July 1, 2013, Person 2 made a $10,000 loan to St. Tammany Workforce Solutions, LLC and pledged a piece of property he owned with an appraised value of $300,000 as collateral to obtain a $200,000 business loan for St. Tammany Workforce Solutions, LLC to be able to operate the Slidell work release program.

43.     St. Tammany Workforce Solutions, LLC operated the Slidell work release program from about July 1, 2013 to about July 1, 2016.

44.     Even after St. Tammany Workforce Solutions, LLC stopped operating the Slidell work release program in about July 2016, it continued dissolving and distributing its assets to B.H., J.T, and Person 2.

45.     Between on or about July 5, 2013, and on or about January 13, 2017, B.H. and J.K. received not less than approximately $1,195,000 from St. Tammany Workforce Solutions, LLC in the form of ownership disbursements, salary payments, and occasional lump sum miscellaneous payments.  B.H. received over 100 payments totaling not less than approximately $600,000, and J.K. received over 100 payments totaling not less than approximately $550,000.

46.     Person 3 was a relative of **STRAIN** who was born in 1987.  **STRAIN** was approximately twenty-four and one-half years older than Person 3.  Person 3 was employed at STPSO.

47.     In or about August 2013, St. Tammany Workforce Solutions, LLC added Person 3 to its payroll.  From about August 2013 until about mid-2016, Person 3 received approximately $30,000 per year from St. Tammany Workforce Solutions, LLC.

**B.      THE CONSPIRACY:**

48.     Beginning at a time unknown, but not later than early 2013, and continuing until at least April 18, 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **RODNEY J. STRAIN, JR.**, together with **Hanson**, **Keen**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, and agree:

a.      For **STRAIN**, an agent of STPSO, an agency of St. Tammany Parish, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, a thing of value from any person, intending to be influenced and rewarded in connection with a transaction and series of transactions of

8

the St. Tammany Parish Sheriff's Office involving $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(1)(B);

b.    To corruptly give, offer, and agree to give, anything of value to any person, intending to reward **STRAIN**, an agent of STPSO, an agency of St. Tammany Parish, in connection with a business, transaction, and series of transactions of the St. Tammany Parish Sheriff's Office involving $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(2); and

c.    To devise and intend to devise a scheme and artifice to defraud and deprive the citizens of St. Tammany Parish of their right to the honest services of **STRAIN**, **Hanson**, and **Keen**, each an employee and representative of the St. Tammany Parish Sheriff's Office, through bribery and kickbacks, in violation of Title 18, United States Code, Sections 1343 and 1346.

## C.    NATURE AND PURPOSE OF THE CONSPIRACY:

49.    It was a purpose of the conspiracy for **STRAIN** to enrich himself and his family members by receiving and accepting money and gifts from **Hanson** and **Keen** in exchange for agreeing to provide favorable official action, namely conferring the right to operate the Slidell work release program, to an entity owned primarily by B.H. and J.K.

50.    It was a further purpose of the conspiracy for **Hanson** and **Keen** to enrich themselves by arranging for **STRAIN** to issue the right to operate the Slidell work release program to an entity owned primarily by B.H. and J.K., children of **Hanson** and **Hanson**, with the understanding that a significant portion of the profits from the enterprise would be funneled back to **Hanson** and **Keen**.

51.     It was a further purpose of the conspiracy to hide, conceal, and cover up the nature and scope of **STRAIN's** illicit agreements and dealings with **Hanson** and **Keen,** including the payment of bribes and kickbacks to **STRAIN**, **Hanson**, and **Keen**, by arranging for intermediaries, including B.H. and J.K., to be straw owners of St. Tammany Workforce Solutions, LLC.

52.     It was a further purpose of the conspiracy to convert to the personal use of the conspirators and others, money and property belonging to the STPSO and the State of Louisiana.

**D.     MANNER AND MEANS OF THE CONSPIRACY:**

The conspiracy was carried out through the following manner and means, among others:

53.     **STRAIN** discussed making **Hanson** and **Keen** the joint owners and operators of the Slidell work release program.  **Hanson** and **Keen** understood that assuming ownership and control of the Slidell work release program would require them to resign from STPSO and, consequently, lose their salaries and pension increases from continued employment with STPSO. **Hanson** and **Keen** expressed this concern to **STRAIN**.

54.     **STRAIN**, **Hanson**, and **Keen** discussed ways to allow **Hanson** and **Keen** to maintain their employment and still profit from the Slidell work release program.  To conceal the scheme, **STRAIN**, **Hanson**, and **Keen** agreed to make B.H. and J.K., children of **Hanson** and **Keen**, straw owners of the Slidell work release program who would then kick back a significant portion of the profits to **Hanson** and **Keen**.

55.     **STRAIN**, **Hanson**, and **Keen** agreed that they needed to find another individual to operate the Slidell work release program because B.H. and J.K. lacked sufficient education, training, experience, or funding to do so.  They decided on Person 2, to whom **Hanson** presented a series of preconditions.  These preconditions included the following: B.H. and J.K. would each own forty-five (45) percent of the Slidell work release program and would each receive forty-five

(45) percent of the profits, while Person 2 would own ten (10) percent, receive a salary, and be responsible for the operating, overseeing and administering of the Slidell work release program.

56.    **STRAIN** agreed to perform and performed official acts in his capacity as Sheriff of STPSO, including signing the cooperative endeavor agreement, which gave St. Tammany Workforce Solutions, LLC the right to operate, and profit from the operation of, the Slidell work release program.

57.    **STRAIN**, **Hanson**, and **Keen** understood that **STRAIN** would perform the official act of privatizing the Slidell work release program in exchange for **Hanson** and **Keen** rewarding him with bribes and kickbacks, including cash payments, gifts, donations to his campaign account, and various financial benefits to members of **STRAIN's** family.  This understanding was based, in part, on the fact that **STRAIN** previously required **Keen** to kickback approximately half of the money **Keen** received from working at the Covington work release program to **STRAIN** in exchange for securing **Keen** the job.

58.    **Hanson** and **Keen** each gave **STRAIN** and his family members a portion of the kickbacks they received from St. Tammany Workforce Solutions LLC, through B.H. and J.K., as a payoff for his official acts.  Some of these payoffs utilized interstate wire communications.

59.    B.H. and J.K. did not operate, oversee, or administer the Slidell work release program.  And, although it was Person 2, who actually operated, oversaw, and administered the Slidell work release program, Person 2 was required to make payments to B.H. and J.K. in addition to their forty-five percent ownership disbursements.

60.    **STRAIN**, **Hanson**, and **Keen** profited directly from the Slidell work release program by submitting, and causing to be submitted, receipts related to personal expenses they incurred unrelated to the Slidell work release program, including travel expenses for hunting trips

11

and international vacations, for which the Slidell work release program then issued reimbursements to them through B.H. and J.K.

61.     **STRAIN, Hanson,** and **Keen** also profited directly from the Slidell work release program by causing checks drawn on the St. Tammany Workforce Solutions, LLC account to be used to pay for personal expenses and benefits.

62.     Person 2 was directed to hire, and did hire, Person 3, an STPSO employee and a relative of **STRAIN**, and pay Person 3 approximately $30,000 per year for a no-show job at the Slidell work release program.

63.     Through the use of interstate wire communications, B.H. and J.K. received payments in the form of checks drawn on the bank accounts of St. Tammany Workforce Solutions, LLC and Person 2

64.     B.H. and J.K. transferred, through means that included the use of interstate wire communications, a significant portion of the profits they received from St. Tammany Workforce Solutions, LLC to their fathers, **Hanson** and **Keen**.

65.     **STRAIN**, **Hanson**, **Keen,** B.H., and J.K. attempted to conceal the scheme by, among other things, (a) hiding **Hanson's** and **Keen's** involvement in and benefit from the Slidell work release program, (b) excluding from the cooperative endeavor agreement the fact that **STRAIN** would receive cash bribes and other financial compensation in exchange for signing the cooperative endeavor agreement, and (c) providing most of the money to **STRAIN** in the form of cash.

E.     <u>**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY:**</u>

In furtherance of the conspiracy and to achieve the objects thereof, the defendant, **RODNEY J. STRAIN, JR.**, and others known and unknown to the Grand Jury, committed and

caused to be committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

66.     On or about June 4, 2013, **STRAIN** signed the cooperative endeavor agreement on behalf of STPSO with St. Tammany Workforce Solutions, LLC, thereby privatizing the operation of the Slidell work release program.

**Kickbacks STRAIN Facilitated to Hanson**

67.     Beginning not later than July 10, 2013, and continuing to at least January 12, 2017, through the use of interstate wire communications, B.H. received not fewer than 131 payments in the form of checks drawn on the bank accounts of St. Tammany Workforce Solutions, LLC and Person 2 totaling not less than approximately $600,000.

68.     Beginning not later than October 8, 2013, and continuing to at least January 3, 2017, on at least 150 occasions, B.H. generated cash totaling at least $425,000, a significant portion of which she either gave to **Hanson** or deposited into bank accounts to be used for the benefit of **Hanson**, from payments made by made by St. Tammany Workforce Solutions, LLC.

Additional overt acts committed for the benefit of **Hanson**:

September 2014

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 69 | 9/2/2014 | Check Deposit | $10,000 | Check number 10377, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Final Dividend check 2nd Qtr, 2014," deposited into the B.H. account.  B.H. converted $4,000 to cash. |
| 70 | 9/09/2014 | Cash Deposit | $4,100 | Deposited into the T.H. and B.H. account. |
| 71 | 9/10/2014 | Telephone Payment of Credit Card | $4,000 | Payment made via telephone from the T.H. and B.H. account to pay down the $4,082.16 balance due on the **Hanson** American Express Gold Card. |

December 2014

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 72 | 12/4/2014 | Check Cashed | $5,000 | Check number 10486, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Dividend check" deposited. |
| 73 | 12/12/2014 | Cash Deposit | $4,000 | Deposited into the T.H. and B.H. account. |
| 74 | 12/12/2014 | Telephone Payment of Credit Card | $4,000 | Payment made via telephone from the T.H. and B.H. account to pay down the $4,041.87 balance due on the **Hanson** American Express Gold Card. |

December 2014 - January 2015

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 75 | 12/22/2014 | Check Deposit | $10,000 | Check number 10499, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Christmas Dividend 2014" deposited into the B.H. account.  B.H. converted $5,000 to cash. |
| 76 | 12/29/2014 | Cash Deposit | $2,400 | Deposited into the T.H. and B.H. account |
| 77 | 12/29/2014 | Telephone Payment of Credit Card | $2,000 | Payment made via telephone from the T.H. and B.H. account to pay down the $4,770.47 balance due on the **Hanson** American Express Gold Card. |
| 78 | 1/6/2015 | Check Deposit | $15,000 | Check number 10509, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Dividend check for Dec 2014" deposited into the B.H. account.  B.H. converted $8,000 to cash. |
| 79 | 1/12/2015 | Cash Deposit | $2,800 | Deposited into the T.H. and B.H. account |
| 80 | 1/12/2015 | Telephone Payment of Credit Card | $2,770.47 | Payment made via telephone from the T.H. and B.H. account to pay down the remainder of the balance due on the **Hanson** American Express Gold Card. |

May 2015

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 81 | 5/1/2015 | Check Deposit | $15,000 | Check number 10621, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Dividend for April 2015" deposited into the B.H. account. B.H. converted $10,000 to cash. |
| 82 | 5/12/2015 | Cash Deposit | $2,200 | Deposited into the T.H. and B.H. account |
| 83 | 5/13/2015 | Telephone Payment of Credit Card | $2,000 | Payment made via telephone from the T.H. and B.H. account to pay down the $2,205 balance due on the **Hanson** American Express Gold Card. |

July 2015

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 84 | 7/1/2015 | Check Deposit | $14,050.58 | Check number 10700, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "June 2015 Dividend" deposited into the B.H. account. B.H. converted $10,050.58 to cash. |
| 85 | 7/7/2015 | Cash Deposit and Check Deposit | $4,699.71 (total) | Check number 10686 in the amount of $2,699.71, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to B.H. for "Travel Expenses" and $2,000 in cash, deposited into the T.H. and B.H. account |
| 86 | 7/7/2015 | Telephone Payment of Credit Card | $4,360.38 | Payment made via telephone from the T.H. and B.H. account to pay down the $4,660.38 balance due on the **Hanson** American Express Gold Card. |

**Kickbacks STRAIN Facilitated to Keen**

87.    Beginning not later than October 7, 2013, and continuing to at least January 13,

2017, through the use of interstate wire communications, J.K. received not fewer than

approximately 146 payments in the form of checks drawn on the bank accounts of St. Tammany Workforce Solutions, LLC and Person 2 totaling at least $550,000.

88.     Between on or about October 7, 2013, and continuing to at least February 23, 2017, on not fewer than 300 instances, J.K. generated cash totaling at least $325,000, a significant portion of which he then gave to **Keen** or made available for **Keen** to use to pay **Keen's** personal expenses from payments made by St. Tammany Workforce Solutions, LLC.

Additional overt acts committed for the benefit of **Keen**:

November 2015

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 89 | 11/9/2015 | Check Deposit | $10,000 | Check number 10826, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to J.K. deposited into the J.K. Citizens account.  J.K. converted $9,000 to cash. |
| 90 | 11/12/2015 | Cash Deposit | $4,000 | Deposited into the Skip Keen account. |

December 2015

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 91 | 12/6/2015 | Travel | N/A | **STRAIN, Keen**, and **Hanson**, among others, traveled to the State of Illinois to go deer hunting. |
| 92 | 12/10/2015 | Reimbursement | N/A | Submission of receipts to St. Tammany Workforce Solutions, LLC for costs incurred by **STRAIN, Keen**, and **Hanson** during hunting trip. |
| 93 | 12/16/2015 | Check Cashed | $778.61 | Check number 10870, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to J.K. cashed. |

January 2016

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 94 | 1/2/2016 | Check Issued | $16,000 | Check number 10905 in the amount of $16,000, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185), made payable to "Big River Outfitters." Deposited on January 19, 2016. |

May – June 2016

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 95 | 5/6/2016 | Check Deposit | $7,000 | Check number 10989, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to J.K. deposited into the J.K. Citizens account. |
| 96 | 5/17/2016 | Debit Card Purchase | $535 | Electronic payment to "Destin West," a Florida resort. |
| 97 | 5/24/2016 | Check Deposit | $662.61 | Check number 10999, drawn on one of the St. Tammany Workforce Solutions bank accounts (bearing number x1185) and made payable to J.K. deposited into the J.K. Citizens account. |
| 98 | 5/27/2016 | Debit Card Purchase | $2,241.70 | Electronic payment to "Destin West." |
| 99 | 6/6/2016 | Debit Card Purchase | $646.43 | Electronic payment to "Sam's Club." |

January – April 2017

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 100 | 1/13/2017 | Check Deposit | $58,716 | Check number 1477, drawn on the Person 2 account and made payable to J.K. for "Tax's" deposited into the J.K. Home Bank account. |
| 101 | 2/13/2017 | Check Deposited | $5,000 | Check number 1026, drawn on the J.K. Home Bank account and made payable to "Cash" deposited into the Skip Keen account. |
| 102 | 2/27/2017 | Check Deposited | $5,000 | Check number 1053, drawn on the J.K. Home Bank account and made payable to V.K. for "Truck" deposited into the Skip Keen account. |

| Overt Act No. | Date | Type | Amount | Description |
|---|---|---|---|---|
| 103 | 3/1/2017 | Check Cashed | $5,000 | Check number 1029, drawn on the J.K. Home Bank account and made payable to "Clifford Keen" cashed. |
| 104 | 3/27/2017 | Check Deposited | $5,500 | Check number 1035, drawn on the J.K. Home Bank account and made payable V.K. for "Lease" deposited into the Skip Keen account. |
| 105 | 4/18/2017 | Check Cashed | $5,000 | Check number 1032, drawn on the J.K. Home Bank account and payable to V.K. for "Lawn Equipment" cashed. |

**Additional Payoffs and Bribes to Rodney J. Strain, Jr. and His Relatives**

106.  Between about Fall 2013 and at least Fall 2016, **Hanson** funneled kickbacks and bribes to **STRAIN** in amounts greater than $1,000 on a recurring basis.

107.  Between about Fall 2013 and at least Fall 2016, **Keen** funneled kickbacks and bribes to **STRAIN** in amounts greater than $1,000 on a recurring basis.

108.  In or about August 2013, Person 2 was directed to hire Person 3, an STPSO employee and a relative of **STRAIN**, and pay Person 3 approximately $30,000 per year for a no-show job at St. Tammany Workforce Solutions, LLC.

January 2015

109.  On or about January 8, 2015, **Hanson** caused B.H. to issue check number 1018 in the amount of $4,000, drawn on the B.H. account and made payable to Person 1, in exchange for **STRAIN's** conferral of the right to operate the Slidell work release program to St. Tammany Workforce Solutions, LLC.

110.  Person 1 deposited the check into a bank account under his custody and control on or about January 15, 2015.

November 2015

111.    On or about November 17, 2015, J.K. cashed check number 10829 in the amount of $2,500, drawn on one of the St. Tammany Workforce Solutions accounts (bearing number x1185) and made payable to J.K.

112.    On or about November 19, 2015, **Keen** caused cash in the amount of $2,500 to be deposited into the Skip Keen account.

113.    **Keen** caused V.K. to write check number 2515 in the amount of $2,500, drawn on the Skip Keen account and made payable to the "Jack Strain Campaign."

114.    On or about November 23, 2015, check number 2515, drawn on the Skip Keen account and made payable to "Jack Strain Campaign," was deposited into the Strain Campaign account.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2 - 13
(18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud)

**A.    AT ALL TIMES MATERIAL HEREIN:**

115.    The allegations of Paragraphs 1 through 114 are hereby realleged and incorporated herein in their entirety by reference.

**B.    THE CRIME:**

116.    Beginning at a time unknown, but not later than early 2013, and continuing until at least April 18, 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **RODNEY J. STRAIN, JR.**, **(a/k/a "JACK STRAIN")**, and **David Hanson**, and **Clifford ("Skip") Keen**, aided and abetted by each other, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of St. Tammany Parish and STPSO of their right to the honest services of **STRAIN**, **Hanson**, and **Keen**, through bribery and kickbacks.  Specifically, **STRAIN** used his

19

authority as a public official to award a public contract worth over $1,000,000 with the intent to steer proceeds to enrich himself, his close friends, and his relatives.

117.    On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, the defendant, **RODNEY J. STRAIN, JR., (a/k/a "JACK STRAIN")**, and **David Hanson** and **Clifford ("Skip") Keen**, aided and abetted by each other and by others known and unknown to the grand jury, for the purpose of executing the above-described scheme and artifice to defraud and deprive the citizens of St. Tammany Parish and STPSO, transmitted and caused to be transmitted by means of wire communications in interstate commerce, the following writings, signs, signals, and sounds:

| Count | Date | Type of Transaction | Amount | Description |
|-------|------|---------------------|--------|-------------|
| 2 | 9/9/2014 | Cash Deposit | $4,100 | Deposit into the T.H. and B.H. account, thereafter used on or about September 11, 2014, to pay the **Hanson** American Express Gold Card in the amount of $4,000 for expenses related to **Hanson's** Hawaiian vacation |
| 3 | 12/12/2014 | Cash Deposit | $4,000 | Deposit into the T.H. and B.H. account, thereafter used on or about December 15, 2014, to pay the **Hanson** American Express Gold Card in the amount of $4,000 for, among other things, expenses related to a hunting trip **Hanson** took and reserving a deluxe ocean view room at the Memories Grand Bahama Beach & Casino Resort |
| 4 | 1/12/2015 | Cash Deposit | $2,800 | Deposit into the T.H. and B.H. account, thereafter used on or about January 12, 2015, to pay the **Hanson** American Express Gold Card bill in the amount of $2,770.47 for a jewelry purchase at Boudreaux's Fine Jewelers |

| Count | Date | Type of Transaction | Amount | Description |
|-------|------|---------------------|--------|-------------|
| 5 | 5/12/2015 | Cash Deposit | $2,200 | Deposit into the T.H. and B.H. account, thereafter used on or about May 14, 2015, to pay the **Hanson** American Express Gold Card bill in the amount of $2,000.00 for a down payment on a 2015 Dodge Durango at Lakeshore of Picayune (Mississippi) |
| 6 | 7/7/2015 | Deposit of Cash and Check Number 10686 (from St. Tammany Workforce Solutions account x1185) | $2,000 (cash) and $2,699.71 (check) | Deposit into the T.H. and B.H. account, thereafter used on or about July 7, 2015, to pay the **Hanson** American Express Gold Card bill in the amount of $4,360.38 for expenses related to **Hanson's** vacation in the Bahamas |
| 7 | 11/12/2015 | Cash Deposit | $4,000 | Deposit into the Skip Keen account, thereafter used between on or about November 12, 2015, and November 24, 2015, by **Keen** to make various personal purchases with a debit card drawn on the Skip Keen account |
| 8 | 11/19/2015 | Cash Deposit | $2,500 | Deposit into the Skip Keen account, thereafter used on or about November 24, 2015, to fund check number 2515 in the amount of $2,500, drawn on the Skip Keen account and made payable to "Jack Strain Campaign" |
| 9 | 12/6/2015 | Debit Card Charge | $70 | Payment made to "DiMaggio's Pizza," drawn on the J.K. Citizens account related to hunting trip to Illinois with **STRAIN, Keen, Hanson,** and others, which, along with additional hunting trip expenses, resulted in reimbursement from St. Tammany Workforce Solutions, LLC in the amount of $778.61 |

| Count | Date | Type of Transaction | Amount | Description |
|-------|------|---------------------|--------|-------------|
| 10 | 1/19/2016 | Check Number 10905 (from St. Tammany Workforce Solutions account x1185) | $16,000 | Made payable to "Big River Outfitters" for a hunting lease in Illinois to be used for the benefit of **Keen** and **Hanson**, among others |
| 11 | 5/17/2016 | Debit Card Charge | $535 | Payment made to "Destin West," drawn on the J.K. Citizens account related to **Keen** family vacation |
| 12 | 5/27/2016 | Debit Card Charge | $2,241.70 | Payment made to "Destin West," drawn on the J.K. Citizens account related to **Keen** family vacation |
| 13 | 6/6/2016 | Debit Card Charge | $646.43 | Payment made to Sam's Club, drawn on the J.K. Citizens account for personal purchases made by **Keen** |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS 14 - 16
(18 U.S.C. § 666(a)(1)(B) – Bribery Concerning Programs Receiving Federal Funds)

**A.    AT ALL TIMES MATERIAL HEREIN:**

118.    The allegations of Paragraphs 1 through 114 are hereby realleged and incorporated herein in their entirety by reference.

**B.    THE CRIME:**

119.    In or about the calendar years identified below, in the Eastern District of Louisiana and elsewhere, the defendant, **RODNEY J. STRAIN, JR.**, did corruptly solicit, demand, accept, and agree to accept a thing of value from a person, intending to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more:

22

| Count | Calendar Year |
|-------|---------------|
| 14    | 2014          |
| 15    | 2015          |
| 16    | 2016          |

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

**NOTICE OF FORFEITURE**

1.      The allegations of Counts 1 through 16 are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.      As a result of the offenses alleged in Counts 1 through 16, defendant, **RODNEY J. STRAIN, JR.**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property real or personal which constitutes or is derived from proceeds traceable to said offenses.3. If any of the above-described property, as a result of any act or omission of the defendant:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third person;

    c.      has been placed beyond jurisdiction of the Court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be divided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code,

Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

PETER G. STRASSER
UNITED STATES ATTORNEY

JORDAN GINSBERG
Assistant United States Attorney
Illinois Bar No. 6282956

ELIZABETH PRIVITERA
Assistant United States Attorney
Louisiana Bar No. 27042

New Orleans, Louisiana
August 29, 2019

24

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ *District of* _____ Louisiana

_____ Criminal _____ *Division*

## THE UNITED STATES OF AMERICA

vs.

### RODNEY J. STRAIN, JR.
#### a/k/a Jack Strain

## INDICTMENT

**INDICTMENT FOR**
**CONSPIRACY TO SOLICIT A BRIBE,**
**GIVE A BRIBE, AND COMMIT HONEST**
**SERVICES WIRE FRAUD, HONEST SERVICES**
**WIRE FRAUD, SOLICITING AND DEMANDING**
**A BRIBE AND NOTICE OF FORFEITURE**

**VIOLATIONS:**   18 USC § 2
18 USC § 371
18 USC § 666(a)(1)(B)
18 USC § 666(a)(2)
18 USC § 1343
18 USC § 1346

*Filed in open court this* _____ *day of* _____
_____ *A.D. 2019.*

_____
*Clerk*

*Bail, $* _____

_____
JORDAN GINSBERG
Assistant United States Attorney